804 F.2d 1280
 256 U.S.App.D.C. 251
 WESTERN UNION INTERNATIONAL, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
Communications Satellite Corporation, American Broadcasting
Companies, Inc., International Relay, Inc., TRT
Telecommunications Corporation, American
Telephone and Telegraph
Company, Intervenors.
RCA GLOBAL COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
International Relay, Inc., American Telephone and Telegraph
Company, Hawaiian Telephone Company, Intervenors.
ITT WORLD COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
American Telephone and Telegraph Company, International
Relay, Inc., Intervenors.
ITT WORLD COMMUNICATIONS INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents
International Relay, Inc., Communications Satellite
Corporation, RCA Global Communications, Inc., American
Telephone and Telegraph Company, Aeronautical Radio, Inc.,
American Broadcasting Companies, Inc., et al., SIN, Inc.,
Dow Jones and Company, Inc., Intervenors.
MCI INTERNATIONAL, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
International Relay, Inc., Communications Satellite
Corporation, RCA Global Communications, Inc., American
Telephone and Telegraph Company, Aeronautical Radio, Inc.,
SIN, Inc., Dow Jones and Company, Inc., Intervenors.
FEDEX INTERNATIONAL TRANSMISSION CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
International Relay, Inc., Aeronautical Radio, Inc., SIN,
Inc., American Telephone and Telegraph Company,
Communications Satellite Corporation,
Intervenors.
MCI INTERNATIONAL, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
International Relay, Inc., Aeronautical Radio, Inc., SIN,
Inc., American Telephone and Telegraph Company,
Communications Satellite Corporation, Intervenors.
 Nos. 84-1202, 84-1235, 84-1261, 85-1155, 85-1162, 85-1450
and 85-1451.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 16, 1986.
Decided Oct. 31, 1986.
 
 Robert E. Conn, with whom Robert Michelson, Washington, D.C., was on the joint brief for petitioners, Western Union Intern., Inc., et al., in Nos. 84-1202, 85-1162, 85-1450 and 85-1451. William J. Byrnes and Nathaniel P. Breed, Washington, D.C., also entered appearances for Western Union Intern., Inc., et al.
 Alexander P. Humphrey, Washington, D.C. entered an appearance for petitioner, RCA Global Communications, Inc., in No. 84-1235 and intervenor in Nos. 85-1155 and 85-1162.
 Theodore J. Fischkin, New York City, entered an appearance for petitioner, ITT World Communications, Inc., in Nos. 84-1261 and 85-1155.
 Steven A. Levy, with whom Kevin C. Boyle and Steven R. Miles, Washington, D.C., were on the brief for intervenor, Intern. Relay, Inc., in Nos. 84-1202, 85-1235, 84-1261, 85-1155, 85-1162, 85-1450 and 85-1451.
 John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Nancy E. Stanley, Asst. Gen. Counsel, F.C.C., Catherine G. O'Sullivan and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents. Barry Grossman, Nancy C. Garrison, Robert B. Nicholson and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 
 
 1
 Sally Katzen, with whom J. Roger Wollenberg, Neal T. Kilminster, John S. Hannon, Jr., and Keith H. Fagan, Washington, D.C., were on the brief for intervenor, Communications Satellite Corp., in Nos. 84-1202, 85-1155, 85-1162, 85-1450 and 85-1451.
 
 
 2
 John L. Bartlett, Robert J. Butler, Douglas B. Jordan and Carl R. Frank, Washington, D.C., were on the brief for intervenor, Aeronautical Radio, Inc., in Nos. 85-1155, 85-1162, 85-1450 and 85-1451.
 
 
 3
 Joseph M. Kittner, Randolph J. May, Washington, D.C., Robert J. Kaufman, New York City, Joseph DeFranco and Howard Monderer, Washington, D.C., entered appearances for intervenors, American Broadcasting Companies, Inc., et al., in Nos. 84-1202 and 85-1155.
 
 
 4
 Lloyd D. Young, Washington, D.C., entered an appearance for intervenor, TRT Telecommunications Corp., in No. 84-1202.
 
 
 5
 Sanford Tannenbaum, Detroit, Mich., Shant J. Harootunian and Ivars V. Mellups, Basking Ridge, N.J., entered appearances for intervenor, American Tel. and Tel. Co., in Nos. 84-1202, 84-1235, 84-1261, 85-1155, 85-1162, 85-1450 and 85-1451.
 
 
 6
 James R. Hobson and Gail L. Polivy, Washington, D.C., entered appearances for intervenor, Hawaiian Telephone Co., in No. 84-1235.
 
 
 7
 Norman P. Leventhal, Washington, D.C., entered an appearance for intervenor, SIN, Inc., in Nos. 85-1155, 85-1162, 85-1450 and 85-1451.
 
 
 8
 Thomas Pace, Princeton, N.J., entered an appearance for intervenor, Dow Jones and Co., Inc., in Nos. 85-1155 and 85-1162.
 
 
 9
 Before EDWARDS, GINSBURG and STARR, Circuit Judges.
 
 
 10
 Opinion for the Court filed by Circuit Judge STARR.
 
 STARR, Circuit Judge:
 
 11
 This case returns us to the world of international telecommunications. Under review are two decisions by the Federal Communications Commission that significantly affect the structure of the international telecommunications industry. See Authorized User on Remand (Authorized User III), 100 F.C.C.2d 177 (1985), Joint Appendix (J.A.) at 306; Direct Access, 97 F.C.C.2d 296 (1984), J.A. at 215. The five petitioners are common carriers whose services enable the public to send record (written) messages to other countries, primarily by means of either undersea cables or space satellites.[1] These petitioners, known as "international record carriers" ("IRCs"), mount three attacks on the FCC's decisions. Petitioners contend: (1) the FCC failed to follow this court's mandate in ITT World Communications, Inc. v. FCC, 725 F.2d 732 (D.C. Cir.1984), in which we held that the FCC abused its discretion in an earlier attempt to restructure the industry; (2) the FCC's decisions were arbitrary and capricious; and (3) the FCC did not fulfill its statutory obligation to ensure petitioners equitable access to the international communications satellite system at just and reasonable rates. After careful review, we reject these various challenges and therefore deny the petitions.
 
 
 12
 * Our earlier opinion described in detail the structure of the international telecommunications industry and the prior FCC decisions pertaining to that industry. See ITT World Communications, 725 F.2d at 736-41. For sake of brevity, we will assume familiarity with the background of the industry as set forth in that opinion;[2] accordingly, we begin our discussion with that case and focus on the relevant events that followed on its heels.
 
 
 13
 In ITT World Communications, we reviewed the FCC's modification of its so-called "authorized user" policy. See Modification of Authorized User Policy (Authorized User II), 90 F.C.C.2d 1394 (1982), J.A. at 43; Authorized User Policy (Authorized User I), 4 F.C.C.2d 421 (1966), J.A. at 1. In Authorized User II, the FCC expanded the class of "authorized users" to include not only common carriers, who were originally the only members of that class, but non-carriers as well. See ITT World Communications, 725 F.2d at 736, 740-41. As authorized users, non-carrier leased-channel customers no longer had to purchase end-to-end services from the petitioners and other carriers. They could instead purchase basic transmission capacity from Comsat, the U.S. signatory of the Intelsat consortium, see infra note 3, and make their own arrangements for connecting circuits. The FCC also decided in Authorized User II to permit Comsat through a subsidiary to offer end-to-end service to non-carrier exchange service customers. See id. Finally, the Commission resolved to remove rate restrictions that equalized both the costs to users of cable and satellite transmissions and the extent to which common carriers used cable and satellite to transmit international messages. See id. These changes, the FCC believed, would enhance intermodal competition--that is, competition between cable and satellite modes of transmission. See id.
 
 
 14
 This court upheld the FCC's view that the Satellite Act of 1962 granted it authority to designate non-carriers as "authorized users." See id. at 742-46 (interpreting 47 U.S.C. Sec. 735(a)(2), (b)(4) (1982), which, respectively, authorize Comsat to lease satellite channels to common carriers and "other authorized entities" and to contract with "authorized users"). We also recognized that the FCC enjoyed discretion to adopt a policy favoring intermodal competition. See id. at 754 n. 52. We concluded, however, that the FCC abused its discretion, because in modifying its authorized user policy it had failed to consider two relevant issues: first, whether at the same time Comsat was permitted to market to non-carrier users, the petitioners and other carriers should be given access to Intelsat, to which Comsat has always had exclusive access; and second, whether petitioners should be able independently to construct and operate earth stations, rather than as members of ESOC, the consortium that then owned all United States earth stations. See supra note 2. We concluded as follows:
 
 
 15
 Until the FCC has considered and determined the widespread effects that the direct access and independent earth station ownership issues will have on the industry structure, however, neither the FCC nor this court can determine rationally which policy [one favoring intermodal competition or one favoring intramodal competition] will best serve the public interest. Consequently, we hold that the FCC has abused its discretion by implementing its Authorized User II policy prior to considering the direct access and independent earth station ownership issues.
 
 
 16
 Id. at 754-55 (footnote omitted). Accordingly, we remanded the case to the Commission. Id. at 755-56.
 
 
 17
 Within a year following remand, the FCC responded to our mandate by concluding three separate proceedings. In April 1984, it denied the IRCs' request for direct access to Intelsat and terminated its proceedings on that issue. See Direct Access, 97 F.C.C.2d 296, J.A. at 215. In December 1984, it granted the IRCs' request for authority to construct and operate earth stations independently, rather than as members of ESOC. Earth Station Ownership, 100 F.C.C.2d 250 (1984), Supplemental Appendix (S.A.) at 130. In January 1985, it readopted its Authorized User II policy, permitting Comsat's World Systems Division ("Comsat Parent") to provide space segment to non-carriers and to offer end-to-end services through a subsidiary. Authorized User III, 100 F.C.C.2d 177, J.A. at 306. Although petitioners challenge only Direct Access and Authorized User III, we earlier found inextricably related the issues all three decisions raise and so each merits description. See ITT World Communications, 725 F.2d at 754.
 
 
 18
 In issuing its notice of injury in the Direct Access proceedings, the FCC announced its intention to focus on two alternative ways the IRCs might obtain direct access to Intelsat. See Direct Access Notice of Inquiry, 80 F.C.C.2d 1446 (1982), J.A. at 95. The first it called the "capital lease option," the second the "IRU option." For purposes of our analysis, it is sufficient to note their common features. Under both options, Comsat would "unbundle" its rate for basic transmission capacity into separate tariffs for space segment and earth station facilities. To obtain space segment, the carriers would make payments to Comsat based on the Intelsat Utilization Charge, the "IUC,"[3] which is the rate Intelsat charges users of the satellite system. In addition to the IUC-based payment, the carriers would pay additional amounts to compensate Comsat for operating costs incurred in obtaining satellite space segment from Intelsat and providing it to the carriers and for costs that Comsat incurred in carrying out its Intelsat signatory functions.
 
 
 19
 Petitioners advanced three arguments in support of direct access. First, it would increase efficiency and put competitive pressure on Comsat to reduce its costs, thereby lowering the costs of satellite access to carriers and non-carrier users. Direct Access, 97 F.C.C.2d at 302-03, J.A. at 221-22. Second, it would prevent Comsat from misrepresenting the costs on which its space segment tariff was based, and so enable the carriers to compete with Comsat on an equal footing. Id. at 319, J.A. at 238. Finally, it would permit the FCC more easily to monitor Comsat's activities so that revenues from Comsat's monopoly activities do not subsidize any Comsat subsidiary created to offer end-to-end services. Id. What underlay these arguments was the carriers' conviction that, if permitted to provide space segment to the public and (through a subsidiary) end-to-end services, Comsat would abuse its monopoly to the carriers' detriment.
 
 
 20
 The Commission was unmoved. It concluded that direct access was not in the public interest; it would not save users money either by increasing efficiency, enhancing competition, or curbing Comsat's allegedly excessive tariffs. Direct Access, 97 F.C.C.2d at 310, J.A. at 229. In assessing the likelihood that direct access would lower costs, the agency examined each category of costs on which Comsat based its space segment tariff. Id. at 310-19, J.A. at 229-38. The FCC concluded that each category was properly allocable to the tariff. (It reserved judgment, however, on whether the numbers assigned to each category reflected Comsat's costs.) In the Commission's view, direct access probably would not reduce any of these costs; it would, rather, simply redistribute the costs among Comsat and the carriers. Id.
 
 
 21
 Next, the Commission considered whether direct access would improve its ability to discover and remedy Comsat overcharges. In this regard, the FCC rejected petitioners' argument that the Intelsat Utilization Charge accurately reflected Comsat's full cost of Intelsat access and therefore would, if employed by the Commission, simplify policing Comsat's tariffs. The IUC, the FCC found, did not fully take into account three elements: (1) Comsat's internal costs of obtaining access from Intelsat and passing it on to the carriers; (2) the costs Comsat incurred in fulfilling its Intelsat signatory obligations--conducting research and development and attending Intelsat meetings, for example; and (3) the approximately 12% after-tax return, to which Comsat was entitled, on its substantial capital investment in Intelsat. Although it rejected the usefulness of the IUC as an authoritative benchmark, the Commission recognized that petitioners had a legitimate concern to keep Comsat rates just and reasonable.[4] 97 F.C.C.2d at 310, J.A. at 229; see also supra note 4. The Commission determined, however, that it could better address these concerns through traditional ratemaking mechanisms and actions under consideration in other proceedings than through the IUC-based direct access options. Id.
 
 
 22
 Finally, the FCC analyzed the likely impact of direct access on competition between the carriers and Comsat (intramodal competition) and between satellite and cable modes of transmission (intermodal competition). In its analysis, the Commission paid particular attention to the interrelation of direct access proposals and its Authorized User II policy.
 
 
 23
 The Commission found that direct access would not enhance intramodal competition. Since direct access would not lower costs, it would not enable carriers to compete with Comsat in the provision of basic satellite transmission capacity. For the same reason, it would not affect the area in which a real potential for competition existed: the provision of end-to-end leased-channel services. In this area, the potential for competition existed not between the IRC's and Comsat, but between the IRCs and their leased-channel customers, the end-users. Under Authorized User II, "the carriers would compete with the end-user's own ability to configure the end-to-end service for itself." Id. at 320, J.A. at 239. Direct access would have no effect on this competition. Similarly, direct access was unnecessary to ensure that the IRCs competed on an equal footing with the Comsat subsidiary permitted under Authorized User II to offer end-to-end services, since the subsidiary would obtain satellite service from the Comsat parent at the same rate as the IRCs obtained it. See id. at 323-24, J.A. at 242-43.
 
 
 24
 The FCC also concluded that direct access was unlikely to produce any of the public benefits associated with increased intermodal competition. The Commission found that granting the carriers direct access to Intelsat's satellate system would in no wise affect favorably their ability to offer cable transmission at rates competitive with satellite transmission. On the other hand, direct access could impair intermodal competition, the FCC feared, if AT & T were granted direct access along with other carriers. The Commission speculated that direct access might enable AT & T through its investment decisions effectively to control the costs of cable and satellite transmissions for the entire industry. This anticompetitive concentration of power could readily be employed, the Commission observed, to the detriment of the public. Id. at 323-25, J.A. at 242-44.
 
 
 25
 Eight months after Direct Access, the FCC concluded its Earth Station Ownership proceedings. 100 F.C.C.2d 250, S.A. at 130. It granted the carriers' requests for permission to construct and operate U.S. earth stations outside ESOC. Id. at 267, S.A. at 147. It also left to ESOC determination the future of that body. Id. at 276-78, S.A. at 156-58. To prevent cross-subsidization from Comsat's space segment services to its earth station services, the Commission ordered Comsat to transfer its ESOC investments to a separate subsidiary. Id. at 285-86, S.A. at 165-66. At the same time, Comsat was directed to "unbundle" its combined earth station access-space segment tariff. Id. at 279-80, S.A. at 159-60. Finally, the Commission granted the carriers' request for increased participation in U.S. dealings with Intelsat. Id. at 281-83, S.A. at 161-63.
 
 
 26
 In the third of this series of proceedings, the FCC considered whether to readopt Authorized User II in light of its decisions in Direct Access and Earth Station Ownership. Authorized User III, 100 F.C.C.2d 177, J.A. at 306. The Commission began by inviting comments on the effects of its decisions in Direct Access and Earth Station Ownership on the issue whether to readopt Authorized User II. 49 Fed.Reg. 19,684, 19,685 (1984), J.A. at 246, 247. It concluded that access to users by the Comsat parent would increase leased-channel customers' choice by enabling them to choose to make their own connecting links to supplement Comsat's space segment service, rather than obtaining these connecting services from the IRCs. Authorized User III, 100 F.C.C.2d at 186, J.A. at 315. Moreover, the potential entry of a Comsat subsidiary into the retail market for exchange services would provide competitive pressure to keep the IRCs' rates down. Id. No significant public detriment countervailed these benefits: The IRCs' ability to serve the public was unlikely to suffer, and their exchange service rates were unlikely to rise, even if they suffered some leased-channel revenue loss. Id. at 192-200, J.A. at 321-29. For these reasons, the Commission reembraced its policy determination first articulated in Authorized User II. Subsequently, the FCC refused to reconsider Authorized User III. Memorandum Opinion and Order, No. 85-323 (June 28, 1985), J.A. at 417.[5]
 
 II
 
 27
 Petitioners' various objections to Direct Access and Authorized User III fall into three broad categories.
 
 
 28
 First. Several contentions go to their charge that the FCC violated the mandate of our prior decision in ITT World Communications. In that decision, petitioners contend, this court ordered the Commission on remand to resolve direct access, earth station ownership, and authorized user issues in a single proceeding. The Commission's failure to consolidate the several proceedings, they maintain, flawed its decisions in at least three ways. For one thing, the FCC's Balkanized approach resulted in the Commission's treating Comsat and the IRC's inconsistently--in Direct Access paying too much attention to Comsat's revenue requirements while in Authorized User III ignoring those of the IRCs. For another, compartmentalized proceedings led, as the IRCs see it, to contradictory factual findings. Finally, they led, petitioners allege, to inconsistent application of legal standards.[6]
 
 
 29
 Second. Petitioners' next set of objections leads them to characterize Direct Access and Authorized User III as arbitrary and capricious in violation of the Administrative Procedure Act. See 5 U.S.C. Sec. 706(2)(A). They attack Authorized User III as based on a stale record. Direct Access, they assert, was flawed by the FCC's misunderstanding of the Intelsat Utilization Charge, and its inadequate economic and competitive analysis.
 
 
 30
 Third. Petitioners argue, finally, that by rejecting their request for direct access to Intelsat and failing properly to monitor Comsat's tariffs, the FCC has ignored its statutory obligation to ensure them access to the international satellite system at just and reasonable charges. See 47 U.S.C. Sec. 721(2). We address each of these categories in turn.
 
 III
 
 31
 * Petitioners' argument that the FCC violated the mandate of ITT World Communicationsis unavailing. In our view, the terms of that mandate were clear, and the FCC faithfully complied with those terms.
 
 
 32
 We expressly ordered the Commission to consider direct access and earth station ownership "prior to" adopting its Authorized User II policy, inasmuch as we had found the issues of direct access, earth station ownership, and authorized user to be "inextricably related." ITT World Communications, 725 F.2d at 754-55, quoted supra. We also indicated that the FCC should "consider[ ] [] whether intramodal competition is consistent with its new policy" of fostering intermodal competition. Id. at 754. We did not, as petitioners would have it, require the FCC to resolve these policy issues in a single proceeding, nor did we mandate implementation of direct access as a means of promoting intramodal competition.[7] On the contrary, our directive implicitly recognized, as we must, that the FCC enjoys discretion to order its own docket. See, e.g., FCC v. Schreiber, 381 U.S. 279, 289, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965); cf. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543-44, 98 S.Ct. 1197, 1211-12, 55 L.Ed.2d 460 (1978).[8] It is not for us to sit as a super-board of directors and instruct administrative agencies how to go about their business. Indeed, in our earlier opinion, we expressly recognized the obvious fact that the Commission is in a much better position than we to assess the impact of direct access and earth station ownership on its authorized user policy. ITT World Communications, 725 F.2d at 754.[9] Finally, far from ordering the FCC to promote intramodal competition, we explicitly declined to displace the FCC's policy-making authority. Id. at 754 n. 52.
 
 
 33
 Following remand, the FCC complied with the specific terms of our mandate. It resolved direct access and earth station ownership issues before it considered readopting its authorized user policy. Its decisions address how the three issues interrelate. See Direct Access, 97 F.C.C.2d at 310, J.A. 229; Authorized User III, 100 F.C.C.2d at 188-200, J.A. at 317-29. The decisions also respond specifically to this court's concerns about the role of intramodal competition. In concluding that the IRCs could not offer space segment at lower rates than Comsat, the Commission made clear that it refused to grant the IRC's direct access to Intelsat primarily because doing so would not increase intramodal competition. See Direct Access, 97 F.C.C.2d at 325, J.A. at 224. On the other hand, it granted the IRCs' request for permission to construct and operate U.S. earth stations because it was convinced that a liberalized ownership policy would lower operating costs and thereby enhance intramodal competition. Earth Station Ownership, 100 F.C.C.2d at 266-67, S.A. at 146-47.[10] Finally, in Authorized User III, the Commission explained that the new authorized user policy would not affect competition between Comsat and the carriers but would instead generate competition between the carriers and users, thereby increasing customer choice. Authorized User III, 100 F.C.C.2d at 193, J.A. at 322.
 
 
 34
 The Commission's resolution of the three issues was consistent.[11] In each of the three decisions, the Commission essentially engaged in a four-part inquiry. Its primary concern, as discussed above, was whether the proposals before it would increase competition in a way that lowered customers' costs or expanded customers' choices. Second, it looked for other ways in which the proposals might benefit the public--for example, by increasing cost efficiencies or service quality, or by curbing excessive charges. See, e.g., Authorized User III, 100 F.C.C.2d at 189-90, J.A. at 318-19; Earth Station Ownership, 100 F.C.C.2d at 269-70, S.A. at 149-50; Direct Access, 97 F.C.C.2d at 319, J.A. at 238. Third, it balanced these possible benefits against potential detrimental effects. See, e.g., Authorized User III, 100 F.C.C.2d at 189-92; J.A. at 318-21; Earth Station Ownership, 100 F.C.C.2d at 272-76, S.A. at 152-56; Direct Access, 97 F.C.C.2d at 324-25, J.A. at 243-44. Fourth, it assessed the regulatory problems of implementing each proposal. See, e.g., Authorized User III, 100 F.C.C.2d at 206-07, J.A. at 335-36; Earth Station Ownership, 100 F.C.C.2d at 276-86, S.A. at 156-66.
 
 
 35
 We are unpersuaded by petitioners' argument that the FCC acted inconsistently in denying direct access to protect Comsat's profitability while readoptingAuthorized User II without considering the IRCs' profitability. Petitioners' Brief at 48-52. To be sure, in Authorized User III, 100 F.C.C.2d at 195, J.A. at 324, the FCC rejected the notion that it should prevent Comsat from providing space segment service to users in order to protect the IRCs' leased-channel revenues:
 
 
 36
 If the IRC's cannot offer leased-channel services at ... rates [competitive with the users' costs to obtain space segment from Comsat and connecting services on their own] and elect to abandon the market, service will be available from Comsat. We see no justification to protect the IRC's from their customers or to deprive users of choice.
 
 
 37
 In Direct Access, in contrast, the Commission attended to Comsat's revenue requirements because Comsat is entitled by statute and Commission policy to a profit. But this difference in treatment is, upon examination, rooted in a policy choice by the Article I branch.[12] We are in no position to question Congress' judgment that a private, for-profit corporation should enjoy in perpetuity a privileged and protected position in the international telecommunications statellite system.
 
 
 38
 After reviewing Direct Access and Authorized User III in light of our decision in ITT World Communications, we are persuaded that the FCC did not violate the mandate of that decision.
 
 B
 
 39
 Petitioners also challenge Direct Access and Authorized User III as arbitrary and capricious. See 5 U.S.C. Sec. 706(2)(A). Under the well-established principles that guide us, we must set aside the Commission's decisions if they lack a rational basis or otherwise violate the requirements of reasoned decisionmaking. See, e.g., Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 46-57, 103 S.Ct. 2856, 2868-74, 77 L.Ed.2d 443 (1983); ILGWU v. Donovan, 722 F.2d 795, 814-15 (D.C.Cir.1983); see also ITT World Communications, 725 F.2d at 742. After subjecting the FCC's decisions to this congressionally mandated standard of review, we conclude that the Commission acted reasonably.
 
 1. Authorized User III
 
 40
 Most of petitioners' criticism of Authorized User III focuses on the FCC's failure to credit evidence that since 1982 the growth of the IRCs' telex revenues has slowed while the growth of their leased-channel revenues has accelerated. Petitioners' Brief at 69-74. They believe that this evidence demonstrates a return in the 1980's to the conditions of the 1960's. Accordingly, they reason, the evidence requires a return to the Authorized User I policy, which grew out of that earlier period and under which Comsat could provide space segment service only to carriers. Id. The Commission's ignoring this trend, they assert, caused it to underestimate the effect of its authorized user policy on the IRCs' profitability. This oversight, they believe, also led the FCC erroneously to conclude that diversion from the IRCs of leased-channel revenues would not require them to raise exchange service rates.
 
 
 41
 Petitioners' premise is fatally flawed; the FCC did consider evidence of a change in rates of growth. Authorized User III, 100 F.C.C.2d at 200-02, J.A. at 329-31. It found the evidence too inconclusive, however, to warrant rejection of the Authorized User II policy and a return to the "arbitrary restrictions" that shielded the IRCs in the 1960's from the rigors of competition. Evaluating the cogency of technical economic data to decide where the public interest lies falls squarely within the Commission's area of expertise and therefore deserves considerable deference from this court. See, e.g., Carstens v. Nuclear Regulatory Commission, 742 F.2d 1546, 1553, 1557 (D.C.Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1985); Telocator Network of America v. FCC, 691 F.2d 525, 538 (D.C.Cir.1982); United States v. FCC, 652 F.2d 72, 88 (D.C.Cir.1980); see also Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc., 419 U.S. 281, 292-93, 95 S.Ct. 438, 445-46, 42 L.Ed.2d 447 (1974); cf. Board of Governors v. Investment Company Institute, 450 U.S. 46, 56 & n. 20, 101 S.Ct. 973, 981 & n. 20, 67 L.Ed.2d 36 (1981) (quoting Board of Governors v. Agnew, 329 U.S. 441, 450, 67 S.Ct. 411, 415, 91 L.Ed. 408 (1947) (Rutledge, J., concurring)).
 
 
 42
 Petitioners have advanced no persuasive reason to invalidate the FCC's evaluation. In an attempt to portray the Commission as blowing hot and cold, the IRCs refer to a decision issued shortly after Authorized User III in which the Commission noted the evidence of changed rates of growth since 1982 in telex and leased-channel revenues. See International Competitive Carrier Policies, 100 F.C.C.2d 1270 (1985), S.A. at 237. In this later decision, however, the Commission did not interpret this evidence to signal a return to conditions prevailing in the 1960's, as petitioners assert.[13] See id., S.A. at 240. Moreover, petitioners' argument ignores the fact that the modification of the "authorized user" policy was not simply an agency response to changed economic conditions. Instead, this policy shift reflected the FCC's considered judgment that regulatory restraints on competition in the telecommunications industry no longer served the public interest. Authorized User III, 100 F.C.C.2d at 201, J.A. at 330. It is now a commonplace that the reevaluation of extant policy is not, standing alone, an indicator of arbitrariness and caprice; to the contrary, it can evidence reasoned decisionmaking. Cf. Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 863-64, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984). The key is whether the agency changed its policy only after reasoned consideration of relevant factors. See, e.g., State Farm, 463 U.S. at 57, 103 S.Ct. at 2874; Public Citizen v. Steed, 733 F.2d 93, 97-99 (D.C.Cir.1984); ILGWU v. Donovan, 722 F.2d at 812-14; NAACP v. FCC, 682 F.2d 993, 998 (D.C.Cir.1982). We are persuaded that, under the circumstances before us, this turnabout in agency policy was in fact reasoned and reasonable.
 
 2. Direct Access
 
 43
 Opponents of the Direct Access decision challenge it as arbitrary and capricious primarily on four grounds. First, Intervenor International Relay, Inc. maintains that the Commission misunderstood the Intelsat Utilization Charge, which under the direct access proposals championed by the IRCs constituted the basis for calculating Comsat's costs of obtaining access to Intelsat's satellite system and providing it to the IRCs. According to International Relay, the IUC functions as a yardstick by which to measure the reasonableness of Comsat's space segment tariff.[14] Second, petitioners criticize the FCC's expression of doubt whether it could easily calculate the amount that would have to be added to the IUC to arrive at Comsat's costs. Third, petitioners believe that the Commission's doubt whether the cost savings of direct access could be passed on to the public conflicts with FCC authority to order that such savings be passed on. Finally, they fault the FCC for failing to keep its promise in Direct Access to ensure just and reasonable Comsat charges through traditional regulatory means.
 
 
 44
 Notwithstanding the force of petitioners' first argument, it appears to us, on reflection, that the Commission correctly understood the IUC; it simply did not believe that using that device would simplify regulation of Comsat's rates. The FCC's judgment about the best regulatory tools to employ in a particular situation is, needless to say, entitled to considerable deference from the generalist judiciary. See, e.g., Computer & Communications Industry Association v. FCC, 693 F.2d 198, 212 (D.C.Cir.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983). Likewise, the Commission's conclusion that direct access would not lower costs to the public required the sort of expert assessment of technical data that the agency is uniquely qualified to make. See, e.g., Center for Auto Safety v. Peck, 751 F.2d 1336, 1342 (D.C.Cir.1985); Carstens, 742 F.2d at 1557.[15] Considering the variable costs that Comsat incurs in addition to its payments to Intelsat based on the IUC, we cannot say the Commission's judgments descended to the depths of arbitrariness and caprice.
 
 C
 
 45
 Upon analysis, we believe that what petitioners characterize as reasons to doubt the rationality of the FCC's decisions are in point of fact complaints about Comsat's rates and the FCC's alleged failure adequately to reduce them.[16] We doubt not for a moment petitioners' right to just and reasonable rates. We also understand petitioners' complaint that Comsat's rates are indeed too high and that the Commission should take action to bring those rates down now. See supra note 16. We are satisfied, however, that this proceeding is not the proper vehicle or context for vindicating that right.
 
 
 46
 As we have made clear, the Commission has taken a rational approach to enhancing customer choice while respecting Comsat's statutorily created position. Its decisions provide the IRCs with an opportunity to compete among themselves and with a Comsat subsidiary in the provision of earth station services. The decisions allow customers to find the least expensive way to arrange leased-channel transmission. And at the same time, they seek to ensure that Comsat does not abuse its monopoly position.[17] The Commission has assured the IRCs that it will continue to monitor Comsat rates. See, e.g., Authorized User III, 100 F.C.C.2d at 195, J.A. at 324. It has, moreover, left open the possibility of reconsidering direct access if the measures taken to curb Comsat's rates and prevent abuse of its monopoly position prove inadequate. Direct Access, 97 F.C.C.2d at 298, 326, J.A. at 217, 245.
 
 
 47
 In deciding that the FCC's approach in these proceedings was rational, we are not, as petitioners maintain, "throwing them to the wolves," forcing them hopelessly to await FCC rate-making action which could wend its way at glacial speed through the Commission's regulatory labyrinth. In other decisions, we have made clear that judicial relief lies to remedy agency action unreasonably withheld. See, e.g., Telecommunications Research & Action Center v. FCC, 750 F.2d 70 (D.C.Cir.1984); see also 5 U.S.C. Sec. 706(1) (1982). A petition to quicken dilatory agency action, however, presents entirely different issues and considerations from those we have addressed here. Fortified by the ancient admonition that sufficient unto the day is the evil thereof, we conclude that the FCC's decisions in Direct Access and Authorized User III comply with the mandate of ITT World Communications and with the APA's requirement of reasoned decisionmaking.
 
 
 48
 Denied.
 
 
 
 [1]
 Petitioners are Western Union International, Inc., RCA Global Communications, Inc., ITT World Communications, Inc., MCI International, Inc., and Fedex International Transmission Corp. (Fedex)
 
 
 [2]
 We distill here our lengthier discussion in ITT World Communications. Satellite and cable are the primary modes of international message transmission. Traditionally, the common carriers owned the cable network; the International Telecommunications Satellite Organization (Intelsat) owned the satellite system. The common carriers included two groups: the IRCs, which provided non-voice, or "record," services; and AT & T, which was practically the sole provider of international voice transmission services. Intelsat is an international joint venture that includes Comsat as the sole U.S. member (or "signatory")
 The IRCs provide two kinds of record transmission services: leased-channel and exchange services. Exchange service consists of a common switched network that connects each subscriber to other subscribers. Examples include telegraph, telex, and TWX. Leased channels, in contrast, are private lines between two or more discrete points. The IRCs provide exchange services on an "end-to-end" basis. In other words, the IRCs carry the message all the way from the user of the service to its final destination. The IRCs may offer leased-channel services, on the other hand, either in an "end-to-end" package or in a "basic transmission" capacity. Basic transmission service requires the user to arrange to get its message to the domestic point at which it leaves the country, and from the foreign point at which it arrives in another country to its recipient in the country's interior. In general, only large, sophisticated users (such as the Department of Defense) can arrange these connecting circuits on their own.
 Before Authorized User II, for the international portion of a message's trip, an IRC could use either cable (which it owned) or obtain basic transmission capacity from Comsat. A two-tiered system prevailed in the international satellite transmission industry. Only Comsat, not the carriers, could obtain space segment facilities from Intelsat. Comsat in turn offered basic transmission capacity exclusively to common carriers (not to the public) consisting of the satellite space segment (obtained from Intelsat) and the half-circuits that carried a message from a U.S. earth station up to a satellite. Comsat obtained the half-circuit from the Earth Station Ownership Consortium ("ESOC"), in which Comsat owned a controlling interest. Common carriers held pro-rata shares of what remained. Comsat offered this half-circuit and space segment to the IRCs at a single, "bundled" rate. As discussed in our earlier opinion, Comsat's exclusive access to Intelsat's satellite system was due largely to its statutorily defined role as the sole U.S. signatory to Intelsat. It was prevented from dealing with non-carriers, on the other hand, as a result of the FCC's policy to protect the IRCs' role as retailers of international record transmissions. See Authorized User I, 4 F.C.C.2d 421 (1966), J.A. at 1.
 
 
 [3]
 A brief description of Comsat's financial relationship with Intelsat is, alas, necessary to understand the IUC. Intelsat is a joint venture of signatories from 110 nations. FCC Brief at 9. As the U.S. signatory, Comsat is an investor in Intelsat; at the same time, it is a user of Intelsat facilities. The IUC is based on Intelsat's estimation of its annual revenue requirements per unit of space segment. Comsat Study, 77 F.C.C.2d 564, 789 App.D (1980). Intelsat uses the revenues generated by receipt of IUCs to meet the following obligations: (1) its maintenance and administrative costs; (2) operating funds; (3) depreciation; and (4) a 14% pre-tax return to signatories for use of capital. Id. Intelsat itself consumes items 1 & 2 of the IUC; it returns items 3 & 4 to its signatories. As a user, Comsat makes payments to Intelsat based on the number of IUCs it uses. As an investor in the system, Comsat pays in a share of Intelsat's capital costs proportionate to its investment in the system. Comsat receives back on its investment a share of Intelsat revenues that is also based on its investment interest. Thus, Comsat's net cost for using Intelsat consists of its share of Intelsat's operating and maintenance costs (items 1 & 2 above) and its capital contributions. See id.; see also Direct Access, 97 F.C.C.2d at 311-12, J.A. at 230-31; Brief of Intervenor International Relay at 23-25
 
 
 [4]
 The Satellite Act of 1962 designed Comsat as a for-profit corporation. 47 U.S.C. Secs. 701(a), 731. Section 201 of the Act directs the FCC to insure that authorized carriers have "nondiscriminatory use of, and equitable access to, the communications satellite system ... under just and reasonable charges." Id. Sec. 721(c)(2) (emphasis added); see also id. Sec. 721(c)(5) requiring FCC to "engage in such ratemaking procedures as will ensure that any economies made possible by a communications satellite system are appropriately reflected in rates....") (emphasis added)
 
 
 [5]
 In their petitions for reconsideration, parties who appeared below pressed arguments similar to those asserted here, and, indeed, reiterative of those advanced in earlier proceedings before the FCC. In addition to challenging Authorized User III, petitioner Fedex, which had not existed before the Direct Access proceeding concluded, sought to argue for reconsideration of Direct Access. See Memorandum Opinion and Order at 4, 6-7, J.A. at 420, 422-23. The FCC dismissed the portion of Fedex's petition pertaining to Direct Access and rejected on the merits the rest of the petition, along with the other petitions for reconsideration. Id
 
 
 [6]
 Specifically, petitioners assert that in Authorized User III, the Commission applied the legal test enunciated in FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953), to determine the desirability of increased competition, but failed to apply this standard in Direct Access
 
 
 [7]
 Petitioners' argument relies primarily on a footnote taken out of context. See Joint Brief by Petitioners Western Union, MCI and Fedex at 42-43 (quoting ITT World Communications, 725 F.2d at 754 n. 51). The language from that footnote is not even this court's words. It is, instead, a remark from an earlier Commission opinion in which the FCC suggests that it will consider direct access and authorized user issues "in a broad rule making proceeding." 725 F.2d at 754 n. 51 (quoting Aeronautical Radio, Inc., 73 F.C.C.2d 535, 536 (1980))
 In addition to their misplaced reliance on an humble footnote, cf. Mikva, Goodbye to Footnotes, 56 U.Colo.L.Rev. 647 (1985), petitioners cite to the FCC's post-argument filing to attempt to show that even the Commission read our opinion to require consolidated proceedings. See FCC's Petition for Rehearing and Suggestion for Rehearing En Banc, J.A. at 201. It goes without saying that the characteristically vigorous language of appellate advocates, particularly those wounded by a litigation loss, is entirely irrelevant to a dispassionate inquiry into the meaning of a judicial mandate.
 
 
 [8]
 Petitioners point out that one of its number, Fedex, had no opportunity to comment on direct access because the FCC terminated the Direct Access proceeding in April 1984, before Fedex came into existence the following August. Petitioners' Brief at 45-49. In its memorandum opinion refusing reconsideration of Authorized User III, the Commission dismissed the part of Fedex's petition that concerned the earlier concluded Direct Access proceedings. See Memorandum Opinion and Order, FCC No. 85-323, at 6-7 (June 28, 1985), J.A. at 417, 422-23. Petitioners believe that the exclusion of Fedex is a reason to fault the FCC's failure to resolve these various issues in an omnibus proceeding. We disagree. It is, of course, possible that Fedex would have had the opportunity to comment on direct access if the FCC had consolidated its proceedings, but that is by no means certain. At all events, Fedex's complaint is, upon analysis, that it was born too late. The FCC is obviously not accountable for prolonged periods of corporate gestation
 
 
 [9]
 Petitioners seem to ignore this court's express deference to the Commission's expertise. They attack the Commission for differing with us on how its decisions in Direct Access and Authorized User III will affect the telecommunications industry. For example, we speculated in ITT World Communications that the authorized user policy would cause a diversion of the IRCs' leased-channel revenues and an increase in their exchange service rates. 725 F.2d at 750. The Commission disagreed. Direct Access, 97 F.C.C.2d at 240-41, J.A. at 321-22. For another example, we hypothesized that direct access would increase intramodal competition, contrary to the FCC's conclusion. See ITT World Communications, 725 F.2d at 752-54; cf. Authorized User III, 100 F.C.C.2d at 195, J.A. at 324. Nonetheless, it should be clear from our prior opinion that we had not the slightest intention to prevent the Commission on remand from assessing all evidence relevant to the issues before it and then making its own judgments. We find these attacks, suggesting as they do that we substitute our views about a complex industry for those of an expert agency, entirely misguided
 For the same reason, we reject petitioners' criticism that in Direct Access the Commission improperly considered AT & T's role. See Petitioners' Brief at 60-64. Petitioners believe that since ITT World Communications did not refer to AT & T, the FCC could not assess how AT & T's gaining access to Intelsat would affect the public interest. Not so. In view of AT & T's size and ability to influence the industry (and its demand for direct access if the IRCs were granted such access), we believe that its possible participation in a regime of direct access was a relevant factor that the Commission could properly take into account. See Direct Access, 97 F.C.C.2d at 323-25, J.A. at 242-44. Petitioners also attack the FCC's treatment of AT & T's role in direct access as arbitrary and capricious. We have considered this challenge and reject it as meritless.
 
 
 [10]
 In their comments to the Commission, petitioners vigorously extolled the benefits of independent earth station ownership. See Earth Station Ownership, 100 F.C.C.2d at 258-64, J.A. at 138-44. Before us, however, their praise is muted. See Petitioners' Brief at 56-57. Their inconstancy should not obscure the fact that the FCC has consistently evaluated proposed policy changes to determine whether they hold real promise of increasing competition and lowering costs to the public
 
 
 [11]
 By finding the three issues "inextricably related," we implicitly required the Commission to resolve these issues in a unified fashion. See ITT World Communications, 725 F.2d at 754. Thus, we set forth here our conclusion that the FCC complied with this term of our mandate, rather than in our discussion of whether the FCC acted arbitrarily and capriciously. We note, however, the obvious point that consistency is also required by the APA's strictures against arbitrary and capricious agency action. See, e.g., Alabama Power Co. v. FCC, 773 F.2d 362, 370-71 (D.C.Cir.1985)
 
 
 [12]
 Indeed, the Commission has never disputed that it treats Comsat differently from the IRCs. It reasonably explains that it must attend to Comsat's statutory guarantee of profitability while it is not statutorily bound so to protect the IRCs. See supra note 4. Thus, the difference in treatment does not indicate a failure by the FCC to resolve the various issues in these proceedings in a unified fashion
 As we mentioned previously, petitioners contend that Direct Access and Authorized User III are inconsistent in another respect. They claim that in Authorized User III the Commission applied the legal test articulated in FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953), for determining the desirability of competition but did not apply this test in Direct Access. See Petitioners' Brief at 53. This contention will not withstand scrutiny. The RCA test directs an agency to consider, first, whether competition in a market is feasible and, second, whether competition would serve the public interest. 346 U.S. at 96, 73 S.Ct. at 1004. In Authorized User III, the Commission found that competition was feasible and desirable. 100 F.C.C.2d at 188-200, J.A. at 317-29. In Direct Access, on the other hand, the Commission determined that direct access would not enhance competition, and so did not proceed to the second part of the RCA test. 97 F.C.C.2d at 319-26, J.A. at 238-45. Although in Direct Access the FCC did not cite RCA, we are satisfied that it analyzed the issue of competition compatibly with the teaching of that case.
 
 
 [13]
 Petitioners' argument that the history of the 1960's is now repeating itself depends on interpreting their evidence to show that in the 1980's users have begun turning away from telex service and turning back to leased-channel service, thereby returning leased-channel revenues to the importance they had relative to telex revenues in the 1960's. In Authorized User III, the Commission rejected this analysis as too "gross," 100 F.C.C.2d at 201, J.A. at 330. Its analysis in International Competitive Carrier Policies likewise indicates that petitioners' view is, in the FCC's opinion, overly simplistic. In Competitive Carrier Policies, the FCC listed several factors in addition to preference for leased-channel service that may explain the decrease in the rate of growth of telex revenues: customer preference for telephone voice service; the rapid expansion of high speed data and facsimile services; and the world economic downturn of the early 1980's. Whether the FCC's analysis is correct or not, its view of the evidence cited by petitioners is consistent in both decisions. It suggests that a much more complex situation obtains in the international telecommunications industry than prevailed in the 1960's
 
 
 [14]
 See supra pp. 1282-1283
 
 
 [15]
 The FCC's ability to make this prediction depended in part, of course, on the data presented to it by parties to the proceeding. The Commission noted that while the IRCs exhaustively criticized Comsat's space segment tariff, they did not submit evidence of how much their end-to-end service customers would save under the direct access proposals. Direct Access, F.C.C.2d at 325, J.A. at 244
 
 
 [16]
 Petitioners note, for example, that Comsat's space segment tariff of $630 exceeds the IUC ($390) by more than 60%. See Petitioners' Brief at 6, 28; see also Comsat Tariff Transmittal, No. 565 (June 5, 1985) (proposing $630 tariff for space segment in response to Commission's requirement that Comsat unbundle its earth station-space segment tariff), J.A. at 256. They understandably express dismay that nonsignatory users of the Intelsat system, the Soviet Union, for example, pay a modest $390 to Intelsat to obtain the same space segment for which they must pay $630. See Direct Access, 97 F.C.C.2d at 306, J.A. at 225. Radio Moscow thus pays considerably less than Western Union must ante up to Comsat for precisely the same service. The IRCs, not surprisingly, do not find comforting Comsat's explanation that the costs of attending Intelsat meetings, administrative costs, and Comsat's right to an 11.48% rate of return accounts for Radio Moscow's (and others') good fortune. Instead, they consider it as powerful evidence that Comsat is a bloated middleman that has outlived its usefulness. See, e.g., Petition for Reconsideration of Fedex International Transmission Corporation (Authorized User III ) 3 (Feb. 19, 1985), J.A. at 355, 360. Whatever its force, that policy argument is plainly one appropriately addressed to the political branches, not to the judiciary
 
 
 [17]
 As discussed above, the Commission has ordered Comsat to conduct any earth station operations and end-to-end services through a subsidiary, and it has required Comsat to file separate earth station and space segment tariffs. See supra p. 7. In addition, in other proceedings the FCC has imposed accounting requirements and ordered structural changes to prevent abuse by Comsat of its monopoly position. See Changes in the Corporate Structure & Operations of the Communications Satellite Corp., 90 F.C.C.2d 1159 (1982), reconsid. denied, 93 F.C.C.2d 701 (1983), Second Memorandum Opinion & Order, 97 F.C.C.2d 145 (1984)
 At oral argument, petitioners expressed concern that through a joint venture, the Comsat parent and its subsidiary could gang up against them. Petitioners have offered nothing to substantiate this fear. Moreover, we have no reason to doubt that the Commission is empowered to respond to any unholy alliances that might eventuate between Comsat and its subsidary. See Authorized User III, 100 F.C.C.2d at 207, J.A. at 336; cf. Celcom Communications Corp. v. FCC, 789 F.2d 67, 70-71 (D.C.Cir.1986) (requiring Commission more fully to address anticompetitive effect of Commission's decision where petitioners elaborated factual predicate for their fear of abuse by competitor).